776 F.2d 1512
 1987 A.M.C. 1132, 54 USLW 2332
 Anastasia SIGALAS, individually, as personal representative
of the Estate of Iacovos Sigalas and Michael
Sigalas, Plaintiff-Appellant,
v.
LIDO MARITIME, INC., the M/V ROYAL ODYSSEY, her engines,
tackle, etc., in rem, Defendants-Appellees.
 No. 84-5787.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 26, 1985.
 
 C. John Caskey, Due, Dodson, deGravelles, Robinson & Caskey, Baton Rouge, La., for plaintiff-appellant.
 Frank J. Marston, Fowler, White, Burnett, Hurley, Banick & Strickroot, P.A., Brett Rivkind, Miami, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before JOHNSON and HENDERSON, Circuit Judges, and ALLGOOD*, District Judge.
 JOHNSON, Circuit Judge:
 
 
 1
 This case presents the question whether a district court may properly grant a motion for summary judgment on grounds of forum non conveniens when, on balance, forum contacts are more strongly in favor of a foreign forum. We hold that a court can properly grant such a motion and accordingly we AFFIRM the order of the district court below.
 
 
 2
 I. BACKGROUND.
 
 
 3
 The appellant-plaintiff, Anastasia Sigalas, brought this wrongful death action on behalf of her sailor husband Iacovos under the Jones Act, 46 U.S.C.A. Sec. 688.[1] Mrs. Sigalas is a Greek citizen and domiciliary and she and her husband were at all relevant times Greek citizens and domiciliaries. Iacovos was a crew member on a luxury cruise ship, the ROYAL ODYSSEY, a Greek flag vessel owned by appellee-defendant Lido Maritime, a Liberian corporation with principal offices in Piraeus, Greece, and with 80% stock ownership by Greek nationals and domiciliaries. The ROYAL ODYSSEY was managed by Royal Cruise Line Ltd. [hereinafter Royal Cruise (Piraeus) ], a Liberian corporation with its principal place of business in Piraeus. In excess of 80% of its shares are held by Greek nationals and domiciliaries. All corporate officers of both Lido and Royal Cruise (Piraeus) are Greek nationals and domiciliaries.
 
 
 4
 The ship plied the North Atlantic and Mediterranean during spring, summer, and autumn. During the winter it called in the Caribbean and in the American ports of Miami, St. Thomas, and San Juan. In all seasons over 90% of ROYAL ODYSSEY ticket sales were to American nationals. Its annual revenues from American sales are approximately $3 million. Royal Cruise Lines (USA) Inc., an American corporation wholly owned by an American who is also a stockholder in Lido, maintained offices in San Francisco as Lido's main American ticket outlet. Lido pays Royal Cruise (USA) a commission on ticket sales, bears all operating expenses and pays the salaries, rent and advertising for the American concern. Lido and Royal Cruise Lines (Piraeus) exercise exclusive control over, inter alia, the itinerary, personnel, maintenance, insurance, supplies, provisions, financing, port agents, and port itinerary of the ROYAL ODYSSEY. The bulk of the witnesses, and almost all those who are as yet undeposed, are Greek nationals and domiciliaries. Mr. Sigalas was hired as a Third Assistant Engineer and signed a Greek contract containing a choice of forum law that stipulated that contractual disputes were to be governed by Greek law in Greek courts.[2]
 
 
 5
 On December 13, 1982, during a transatlantic voyage departing from Piraeus, bound for Miami, the ROYAL ODYSSEY called at the port of Dakar, Senegal. While docked in Dakar, Mr. Sigalas began to experience cardiac disruptions and was placed in the ship's infirmary under the care of the ship's doctor, a Greek national and domiciliary, and the ship's nurse, a British national and domiciliary. After the ship set sail Mr. Sigalas suffered a heart attack and the ship returned to Dakar. Local medical facilities were inadequate, and Mr. Sigalas expired. His widow brought this suit for malpractice and seeks $1.3 million in damages.
 
 
 6
 This action was filed in rem and in personam alleging wrongful death under the Jones Act in the United States District Court for the Southern District of Florida on December 22, 1983.[3] The appellee tendered an answer on January 9, 1984, asserting, inter alia, the affirmative defense of forum non conveniens. Thereafter the appellant undertook extensive depositions and interrogatories. The parties were notified on May 25, 1984, that a final pretrial conference would be held on September 7, with trial at any time thereafter.
 
 
 7
 On August 21, sixteen days prior to the final pretrial session with the trial judge, appellee filed a motion for summary judgment on grounds of forum non conveniens asserted originally in its answer. Appellant filed a brief in opposition to that motion on September 4, alleging material issues of fact in controversy and offering an affidavit of counsel under Fed.R.Civ.P. 56(f)[4] on the grounds that the only evidence of applicable foreign law was provided by defendant's co-counsel.[5] Appellant also requested an extension of one week under that Rule to file an additional affidavit both on the choice of law question and on the applicability of foreign law. The trial court refused this request at the pretrial conference and heard oral argument on the motion for summary judgment that day. Later that day the district court entered an order granting summary judgment under the doctrine of forum non conveniens, noting appellee's agreement to accept process and jurisdiction of the Greek courts over this matter, to waive any statute of limitations bar, to cooperate in discovery, and to pay any judgment entered against it.
 
 
 8
 Appellant filed this appeal. By order of this Court on November 9, 1984, the parties were directed to advise the Court whether they viewed the dismissal of the district court as a final appealable order and, if not, whether there existed any other authority to hear this appeal. Briefs were filed. On December 11, this Court notified the parties that the jurisdictional questions would be considered after briefing on the merits.
 
 
 9
 This case poses six questions on appeal: A) Was the order of the district court a final appealable order? B) Did the district court err in holding that American law is inapplicable? C) Did the district court err in dismissing this action? D) Did the district court err in rejecting appellant's request under Rule 56(f) for more time to oppose defendant's affidavit on the relevant foreign law? E) Did the district court err in its disposition of claims for alleged outstanding wages? F) Did the district court take inadequate steps to secure the Letter of Undertaking issued to appellant on appellee's behalf?
 
 
 10
 II. ANALYSIS.
 
 
 11
 A. Appeals of summary judgment and forum non conveniens.
 
 
 12
 This Court has not yet considered whether, under the final judgment rule, an order granting summary judgment on grounds of forum non conveniens is final, and hence appealable under 28 U.S.C.A. Sec. 1291 (1985), when a court places conditions on the grant of summary judgment. Specifically, many courts granting motions of forum non conveniens make dismissal contingent on the defendant's promise to submit to the jurisdiction of another forum, to waive any statute of limitations problems, or to agree to satisfy any judgment rendered in the other court. If the defendant fails to follow this agreement, the adverse party may return to the original forum and maintain his action. Because the court below entered an order with similar reservations, we directed the parties to file briefs on this question. We now hold that the disposition of a case under the doctrine of forum non conveniens, even with certain prophylactic conditions, constitutes an appealable final order.
 
 
 13
 Disposition of a case on forum non conveniens grounds per se is a final order subject to appeal. Menendez Rodriguez v. Pan American Life Insurance Co., 311 F.2d 429, 432 (5th Cir.1962), vacated on other grounds, 376 U.S. 779, 84 S.Ct. 1130, 12 L.Ed.2d 82 (1964). But there is uncertainty whether conditions of the sort noted supra make such order interlocutory. In considering the somewhat elusive concept of finality, we find persuasive and adopt the reasoning of the Fifth Circuit in Cuevas v. Reading & Bates Corp., 770 F.2d 1371 (5th Cir.1985). In determining finality a court's analysis must focus on the underlying effect of a dismissal rather than on a parsing of the language of the order. Id. at 1375.
 
 
 14
 In this case, as in Cuevas, the trial court ordered dismissal while noting clearly that Lido had agreed to a number of conditions. But just as in Cuevas, that order
 
 
 15
 "does not purport to retain any even vestigial jurisdiction over the alleged causes of action. The order does not stay the actions pending fulfillment of its conditions; it does not provide for the court to reexamine at any future date the merits of the issues it had considered; nor does it contemplate the entry of any further orders regarding the merits of any such determinations, or provide for automatic reinstatement of the suit upon the failure of the appellees to conform to its conditions.... Hence ... the conditions imposed in the district court's order of dismissal act in practical manner as conditions subsequent to the dismissal, not as conditions precedent."
 
 
 16
 Id. at 1376 (emphasis in original).
 
 
 17
 The effect is that dismissal for inconvenience will function in a fashion similar to dismissals without prejudice. The plaintiff is sent to another forum and should the defendant not abide by his representations to the original court the plaintiff may return promptly to the original forum and be heard even if the statute of limitations has already tolled in the original court. The rule we adopt today is compelled by logic. If forum non conveniens dismissals could only be appealed if effected unconditionally we would destroy the great usefulness of this jurisdictional doctrine. It would present a district court with the Hobson's choice of unconditional dismissal to a foreign forum, conditional dismissal that could not be reviewed on appeal until the foreign action was concluded and retained American court jurisdiction exhausted, or retained jurisdiction with the case heard on the merits. There could be little doubt as to the disposition of the vast bulk of such motions were we to impose such limitations.
 
 
 18
 B. The determination that this case is controlled by Greek Law.
 
 
 19
 This Circuit has not ruled on the standard of review for choice of law questions. However two other circuits have held that such determinations are subject to de novo review on appeal. Bailey v. Dolphin Intern., Inc., 697 F.2d 1268, 1274 (5th Cir.1983); Phillips v. Amoco Trinidad Oil Co., 632 F.2d 82, 84 (9th Cir.1980), cert. denied sub nom., Romilly v. Amoco Trinidad Oil Co., 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981). We reach a similar conclusion and hold that the resolution of choice of law questions is subject to independent review on appeal to this Court.
 
 
 20
 The seminal case on choice of law in admiralty is Justice Jackson's opinion for the Court in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). That case involved a Danish sailor who, while temporarily in New York, joined the crew of a Danish flag ship, owned by a Dane, under a contract with a Danish choice of forum clause. He was injured in Havana harbour and brought an action for maritime tort under the Jones Act. At issue was under which nation's law was Larsen to be compensated for his injury.
 
 
 21
 In rejecting the sailor's position that American law should govern, Justice Jackson noted that, despite the catholic character of the language of the Jones Act (i.e. "any seaman who shall suffer injury" may sue in American courts), considerations of fairness and the usual constraints on subject matter jurisdiction made clear that the breadth of the language could not be taken literally. Absent a modicum of self-restraint "it is not difficult to see that a multiplicity of conflicting and overlapping burdens would blight international carriage by sea." Id. at 581, 73 S.Ct. at 928. "Mutual forebearance" was appropriate.
 
 
 22
 Federal courts needed some unifying body of principles enabling them to deny jurisdiction over cases better heard in foreign tribunals. Jackson selected for that intellectual endeavor a contacts-based choice of law analysis and thereupon set out a number of factors relevant to the task: 1) the place of the wrongful act --"of limited application to ship-board torts, because of the varieties of legal authority over waters she may navigate," id. at 583, 73 S.Ct. at 929; 2) the law of the flag --"the most venerable and universal rule of maritime law relevant to our problem ... [is the] cardinal importance [given] to the law of the flag .... the weight given to the ensign overbears most other connecting events in determining applicable law," id. at 584-85, 73 S.Ct. at 929; 3) the allegiance or domicile of the injured[6]--but "transitory [presence in an American forum creates] no such national interest in, or duty toward, [a plaintiff] as to justify intervention of the law of one state on the shipboard of another," id. at 587, 73 S.Ct. at 930; 4) the allegiance of the defendant shipowner --as the practice of flags of convenience has grown, "our courts on occasion have pressed beyond the formalities of more or less nominal foreign registration to enforce against American shipowners the obligations which our law places on them," id. at 587, 73 S.Ct. at 931; 5) the place of contract --this is entitled to little weight because a "seaman takes his employment, like his fun, where he finds it," but absent an overriding policy consideration, "the tendency of the law is to apply in contract matters the law which the parties intended to apply," id. at 588-89, 73 S.Ct. at 931;[7] 6) inaccessibility of the foreign forum in terms of the inconvenience to the seaman in returning to a foreign court--while this "might be a persuasive argument for exercising a discretionary jurisdiction to adjudge a controversy ... it is not persuasive as to the law by which it shall be judged," id. at 589-90, 73 S.Ct. at 932; 7) the law of the forum --this too is entitled to little weight because "fortuitous circumstances ... often determine the forum." Id. at 590-91, 73 S.Ct. at 932.
 
 
 23
 Lauritzen sought to reconcile the expansive reach of the Jones Act with the principles of comity that underlie international law so as to "foster amicable and workable commercial relations." Hellenic Lines v. Rhoditis, 398 U.S. 306, 318, 90 S.Ct. 1731, 1738, 26 L.Ed.2d 252 (1970) (Harlan, J., dissenting). It is clear, both from Lauritzen and from the majority opinion of Justice Douglas in Rhoditis, that these factors are not to be interpreted as an exhaustive list, nor are they to be balanced arithmetically. Rather, a court must view the case as a whole in order to determine which law can most fairly be applied to govern the contractual relationship. "The significance of one or more factors must be considered in light of the national interest served by the assertion of Jones Act jurisdiction." 398 U.S. at 309, 90 S.Ct. at 1734. In some cases one factor alone, such as the flag, will be sufficient to tip the choice of law determination. In others, as in Rhoditis, a court may choose to disregard the flag, the nationality of the plaintiff, and the choice of forum clause in the contract because of the "substantial and continuing contacts that this alien owner has with this country." Id. at 310, 90 S.Ct. at 1734.[8] As always, flexibility in application is had at the expense of certainty in outcome.
 
 
 24
 In this case the court below set out the national contacts based on the seven Lauritzen criteria and determined that Greek law was applicable. It found that the place of the wrongful act was Senegal, the ship flew under a Greek flag, the injured seaman was Greek, the shipowner was nominally Liberian, the place of contract was Greece, Greek courts were accessible, the law of an American forum is inapplicable when defendants are involuntarily made parties, and the base of operations was disputed.
 
 
 25
 The appellant argues that it was erroneous to consider the lex loci delicti commisi, the lex locus contractus, and the accessibility of the foreign forum which she claims have been "rejected" by the Supreme Court.[9] She urges that this case is controlled by Rhoditis, which case held that the law of the flag is less persuasive when the vessel flag is of convenience. Instead we should look through the Greek facade and find that, since Lido Maritime is incorporated in Liberia, Liberian law controls. This is convenient for her, because Liberia by statute has adopted American court-made admiralty law as its own. Thus she presents us with a renvoi argument--apply the law of Liberia which in turn directs us to our own substantive jurisprudence.
 
 
 26
 It is clear from the language of both Lauritzen and Rhoditis that the Court there pared away veneer legal formalisms that would otherwise shield owners from their own law. Here over 80% of the stock in the relevant corporations is held by Greeks, who exercise complete control over the day-to-day management of the ROYAL ODYSSEY. It is not the flag but the nation of incorporation that is of convenience. We can and do disregard that and find, contrary to the determination of the district court, that the allegiance of the owner is Greek, not Liberian. That buttresses the opinion below.
 
 
 27
 Mrs. Sigalas also submits that we should be guided by the weight accorded in Rhoditis to what is in essence an eighth factor--the "actual operational contacts that this ship and this owner have with the United States." 398 U.S. at 310, 90 S.Ct. at 1734. She couples that with a plea for the safety of the American passengers aboard the ROYAL ODYSSEY whose health she seeks to protect from the incompetence of the ship's doctor. Neither argument has merit. As to the former, this case is very different than Rhoditis, for there the nominally Greek corporation had its largest office in New York, 95% of its stock was held by a Greek citizen who had been an American domiciliary for twenty five years, the ship's home port was in America, its management and operations were directed out of New York, and its entire income came from transporting cargo to or from the United States. In this case the facts cut in the opposite direction on all of these points except that the bulk of Lido's revenue comes from American pocketbooks. That alone is not enough to justify application of American law. Were this an American passenger the posture of this case might be quite different, but such a case is not presented today and, for the same reason, Mrs. Sigalas' ad populum for the health of American passengers is beyond the scope of the current case and controversy.
 
 
 28
 C. The decision to dismiss on forum non conveniens grounds.
 
 
 29
 The trial court entered summary judgment in this case upon a motion of forum non conveniens.[10] The granting of such a motion is entrusted to the "sound discretion of the trial court," Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257, 102 S.Ct. 252, 266, 70 L.Ed.2d 419 (1981), and may be reversed only if it constitutes a clear abuse of discretion. Chiazor v. Transworld Drilling Co., 648 F.2d 1015, 1017 (5th Cir.1981).
 
 
 30
 To resolve this question we again turn to the analysis of Justice Jackson. In Gulf Oil Co. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), he laid out another list of factors private and public that aid courts in determining whether forum non conveniens dismissal is appropriate. Among the former were availability of means of proof, access to witnesses and process to compel their attendance at trial, ability to view the premises where the conduct in question occurred, the enforceability of an American court judgment in another jurisdiction, "and all other practical problems that make trial of a case easy, expeditious and inexpensive." Id. at 508, 67 S.Ct. at 843.
 
 
 31
 The public factors recognized that hearing cases of no interest to the United States would exacerbate docket congestion, would impose costs on the community in terms of judicial resources and jury duty, would foster the need to "untangle problems in conflict of laws" and to decide cases "in law foreign" to the court, and would conflict with the general interest in "having localized controversies decided at home." Id. at 508-09, 67 S.Ct. at 843. In articulating these lists, however, the Court was again careful to note that these factors were in no respect exhaustive or dispositive. Courts were to retain flexibility in responding to each case presented. Id. at 508, 67 S.Ct. at 843.
 
 
 32
 The Supreme Court extended upon Justice Jackson's reasoning and likewise responded to the problem of forum shopping in Piper Aircraft Co. v. Reyno, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). When the factors of public and private convenience articulated in Gilbert counsel against hearing a case in American courts, judges should send the plaintiffs away. Though traditionally the plaintiff's choice of forum is to be respected, Gilbert, 330 U.S. at 508, 67 S.Ct. at 843, when the plaintiff or real party in interest is foreign, that presumption is weakened. Reyno, 454 U.S. at 255-56, 102 S.Ct. at 265-66.
 
 
 33
 The Supreme Court rejected the usual canard offered by courts in refusing dismissals. It is no longer sufficient to retain jurisdiction simply because the remedy available in an alternative forum is less substantively generous. Id. at 249-55, 102 S.Ct. at 262-66. Unless the other nation affords a remedy "so clearly inadequate or unsatisfactory that it is no remedy at all," substantial weight may not be given to this consideration. Id. at 254, 102 S.Ct. at 265. Forum non conveniens dismissals are desirable because they obviate the need to engage in "complex exercises in comparative law." Id. at 251, 102 S.Ct. at 263. The need to resolve and apply foreign law should "point [the trial court] towards dismissal...." Id.
 
 
 34
 The facts of this case make clear that the district court was not in error. The private factors of convenience require dismissal. As to the witnesses and deponents, fifteen are located in Greece, one in Britain, and seven in the United States. Of the seven Americans, four are merely representatives of American corporations indirectly related to the case. Those witnesses as yet undeposed, including the doctor charged with malpractice, are Greek; these witnesses are not subject to American process. Thus the cost factor too suggests dismissal. As to the public convenience considerations, the court below justified its dismissal in part on its heavy case load. We must be reluctant to impose on the district court the burden of untangling the law ultimately applicable here, since Greek law may direct that the law of the place of injury will control--meaning Senegal. In sum, Mrs. Sigalas represents the archetypal foreign plaintiff bringing her foreign tort claim to American courts to secure relief more generous than she would get under the law of her homeland. Greece has strong contacts with this case. America has virtually none.
 
 
 35
 Finally, appellant claims that the district court improperly granted the motion for forum non conveniens, first, by dismissing this case under the supposed rationale that a finding that foreign law governs ipso facto dictates dismissal and, second, by dismissing the case at pretrial conference after lengthy discovery when it was ready to be tried on the merits.
 
 
 36
 As to the former, it is clear from the record that the district court did not order dismissal solely because Greek law controlled. But in any event, the Supreme Court has suggested firmly that, unless there is some idiosyncracy in the facts of a case to be resolved under foreign law, it should ordinarily be dismissed in favor of a foreign tribunal. 454 U.S. at 251, 260, 102 S.Ct. at 263, 268. As to the second, the basis of her complaint is surprise and wasted effort. There was no surprise. The original answer included appellee's defense of forum non conveniens. Appellant fully briefed the question. We will not restrict the ability of district courts to dismiss cases on motions of forum non conveniens when it becomes clear there are no factual issues in dispute.
 
 
 37
 The wasted effort argument suggests that appellant was put to great time and expense answering appellees' depositions and interrogatories only to have the merits adjudicated before trial. In fact it was the appellant who did all of the deposing. Appellees did none. The expenses Mrs. Sigalas incurred were of her own making. An otherwise meritless case may not be bootstrapped past summary judgment merely because the plaintiff expended much effort and money in the preliminary phase of the case.
 
 
 38
 D. The trial court's refusal to grant appellant's request for leave to file an affidavit in opposition to summary judgment under Rule 56(f).
 
 
 39
 A motion for a continuance under Rule 56(f) " 'directly and forthrightly invokes the trial court's discretion.... It naturally follows, therefore, that absent abuse of discretion, the trial court's determination will not be interfered with by the appellate court.' " American Lease Plans, Inc. v. Silver Sand Co., 637 F.2d 311, 318 (5th Cir.1981).
 
 
 40
 The gist of appellant's complaint is that the court below prematurely chose to move on the motion for summary judgment, having before it only the affidavit of appellees' counsel offering his own legal judgment that Greek law was controlling. Appellant argues that she knew that Greek law was not controlling and that Greek courts would not be accessible, but needed an extension of one week to secure the information from Greece necessary to prove her claim. Mrs. Sigalas argues that Liberian law should control under the renvoi principle and that Greek courts would not be adequate because they would decide this case under Senegalese law and it is not clear that Senegal would offer the same strict liability that was available under Greek law. Neither of these arguments is dispositive (or even correct) in light of the holdings in Lauritzen and Reyno discussed above.[11]
 
 
 41
 The court below did handle this matter with some celerity. But given the great congestion in our courts we will not criticize a judge for expediting disposition of a meritless case. The court below understood the law in this area and properly applied it to the facts. Appellant can ask no more. If there was error here it was not so prejudicial as to rise to the level of clear error necessary to justify disturbing the judgment below.
 
 
 42
 E. The wage claim.
 
 
 43
 Appellant argues that it was error for the court below to dismiss the complaint on summary judgment grounds because there was still a material question of fact at issue--namely a claim for unpaid wages under 46 U.S.C.A. Sec. 596.[12] That statute provides that a seaman is to be paid within two days of his discharge or termination from employment. Mrs. Sigalas claims she sent her husband off with a given amount of money and that when his body was returned he had almost the same amount in his pocket. Appellees claim the seaman was not paid because his wages were set off against a loan he took out while on board. Mrs. Sigalas claims that the signature on the loan form does not match other specimens of her husband's handwriting. These items are not in the record.
 
 
 44
 To constitute a cognizable wage claim under Section 596 that claim must be advanced in "good faith." Fitzgerald v. Liberian S/T Chryssi P. Goulandris, 582 F.2d 312, 315 (4th Cir.1978) (per curiam ). Whether such a claim is bona fide is a factual question entrusted to the discretion of the trial court and subject to reversal only if clearly erroneous. Morewitz v. Andros Compania Maritima, S.A., 614 F.2d 379, 381-82 (4th Cir.1980).
 
 
 45
 Wage claims under Section 596 are due and payable upon discharge. It is one of the idiosyncracies of admiralty law that "death is not a discharge" for purposes of Section 596. Fitzgerald, 582 F.2d at 313-14. For wages to become payable prior to discharge there must be a demand for payment under Section 597. Accordingly, suit cannot be maintained on a wage claim under Section 596 unless prior to suit there has been a demand for payment and a denial or disregard of that demand. There is nothing on the record here to suggest that the required demand was tendered. That being the case, the wage claim is not made in good faith; "it follows that the district court was not required to exercise jurisdiction...." Id. at 315. We find that the district court's factual conclusion was not clearly erroneous. This argument is mere makeweight--an attempt to manufacture jurisdiction over one minor issue in order to force the trial court to hear the larger questions.[13] Summary judgment was properly entered.
 
 
 46
 F. The transfer of security.
 
 
 47
 The appellant also claims that the district court abused its discretion by not adequately providing for the retention of appellant's contractual security given by the appellees. She is concerned that if we affirm on forum non conveniens and send her to Greece the security agreement will be revoked and she will not be able to collect from appellees.
 
 
 48
 This has no merit. The dismissal order entered below was conditioned expressly on the appellees' agreement "that in the event a final judgment is reached by the Greek court the Defendants agree to satisfy said judgment." Appellees have repeatedly affirmed their willingness to abide by this agreement. Under the rule we announce in Section A, supra, Mrs. Sigalas would be able to return to American court and pursue her claim without prejudice if the appellees fail to abide by this agreement. Accordingly, it has no merit.
 
 
 49
 III. CONCLUSION.
 
 
 50
 We find that the district court properly granted the motion for summary judgment on grounds of forum non conveniens. As to each of the appellant's contentions we find no merit. Accordingly in all respects the decision of the district court is
 
 
 51
 AFFIRMED.
 
 
 
 *
 Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 The Act provides in relevant part:
 Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury ... and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain [a similar action] .... Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.
 
 
 [2]
 Moreover, it is agreed upon that the Piraeus Greek Courts will be exclusively competent for the solution of any dispute deriving herefrom, by way of reference to the Greek Laws, the recourse to the Courts of any other country and the application of any other Law other than the Greek Law being excluded and forbidden
 
 
 [3]
 In exchange for forebearing her right to perfect a seizure of the ROYAL ODYSSEY under admiralty law to secure her claim, Mrs. Sigalas accepted a contractual Letter of Undertaking by an American insurer guaranteeing payment of any judgment up to $500,000
 
 
 [4]
 Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just
 
 
 [5]
 On appeal appellant's counsel offers on the Greek law question the affidavit of Professor A.N. Yiannopoulos of Tulane Law School. Professor Yiannopoulos is of counsel with appellant's counsel's law firm. This represents an improper and highly irregular attempt to augment the record on appeal without leave of the court or notice to the adverse party; the material contained in Professor Yiannopoulos' affidavit is beyond the scope of matters appropriately considered in deciding this case. It played no part in our deliberations or in the disposition of this case
 
 
 [6]
 This Court has found the plaintiff's domicile to be especially significant in choice of law analysis. Symonette Shipyards, Ltd. v. Clark, 365 F.2d 464, 467 (5th Cir.1966), cert. denied, 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967)
 
 
 [7]
 The Supreme Court has strongly reaffirmed the weight we must accord to choice of forum clauses in maritime contracts. See, The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 9, 11, 92 S.Ct. 1907, 1912, 1913, 32 L.Ed.2d 513 (1972)
 
 
 [8]
 Likewise, in Bailey v. Dolphin Intern., Inc., 697 F.2d 1268, 1275 n. 22 (5th Cir.1983), the Fifth Circuit refused to apply American law even if, in that case it was assumed, the court was presented with an American flag vessel, owned by a United States corporation, with its ultimate base of operations in the United States, because "the day-to-day operational decisions were made in Singapore and Indonesia." In all cases the Court must look for that "substantial relation which would justify the application of American law." 697 F.2d at 1276 n. 23
 
 
 [9]
 This is obviously incorrect. While Justice Jackson downgraded the importance of these factors in choosing the applicable law, he did not "reject" them as appropriate points of consideration
 
 
 [10]
 The appellant scoffs at "the now fashionable plea of forum non conveniens." This doctrine is neither new nor inappropriately relied upon. The increased usage of this plea represents a reasoned attempt to apply ancient principles of the common law to the complicated international choice of law questions increasingly presented to district courts. It provides a workable intellectual tool with which courts can attack these vexing jurisdictional questions, separating out for hearing only those cases where contacts with the American forum predominate. See, Note, Forum Non Conveniens and the Extraterritorial Application of United States Antitrust Law, 94 Yale L.J. 1693 (1985). Its use is to be favored
 
 
 [11]
 The appellant makes a number of less than veiled suggestions that we ought not entrust this case to the legal processes of any of the several small nations possibly appropriate. We cannot and will not, without more than the appellant's mere assertion, assume that the legal processes of other sovereign nations are substantively or procedurally inadequate per se
 
 
 [12]
 The statutory provisions in Sections 596 and 597 were repealed as of August 26, 1983, and replaced by provisions at 46 U.S.C.A. Secs. 10301, et seq., 10501, et seq. (1985). The revisions in the statute do not appear to work any changes relevant to this appeal
 
 
 [13]
 While it had no effect on our disposition of this issue, we must note that the wage claim appears particularly hollow when one discovers that Mrs. Sigalas is represented by a firm the senior partner of which has recently published an article that is a virtual "how to" manual for bringing in America claims involving foreign seamen in the face of American court skepticism. He points out the obvious advantage for these seamen because they "will almost universally enjoy a more munificent damage recovery if the claim can be brought in an American ... court...." Due, Rights of Foreign Seamen in American Courts--The Law Into the '80's, 7 Maritime Lawyer, 265, 265 (1982). Included among the tricks of the trade is the use of a Section 596 wage claim so as to force a court to "also retain jurisdiction over the related personal injury claim ... and adjudicate the entire controversy." Id. at 276